Case No. 22-1825

---

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

LAURA TARTARO-MCGOWAN,

*Plaintiff-Appellant*,

v.

INOVA HOME HEALTH, LLC, *et al.*,

*Defendants-Appellees.*

---

**On Appeal from the United States District Court for the Eastern District of Virginia Case No. 1:21-cv-00298-RDA-TCB**

---

## RESPONSE BRIEF OF DEFENDANTS-APPELLEES INOVA HOME HEALTH, LLC AND ALTERNATE SOLUTIONS HEALTH NETWORK, LLC

---

Steven E. Seasly, Esq. (0070536)
sseasly@hahnlaw.com
Andrew J. Wolf, Esq. (0091054)
awolf@hahnlaw.com
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
216.621.0150 – Telephone
216.241.2824 – Facsimile

*Counsel for the
Inova Home Health, LLC and
Alternate Solutions Health Network, LLC*

## DISCLOSURE STATEMENT

Pursuant to FED. R. APP. P. 26.1 and Local Rule 26.1, Defendants-Appellees Inova Home Health, LLC and Alternate Solutions Health Network, LLC state that their Disclosure Statements, filed on August 17, 2022 as ECF No. 4 and 5, are still accurate.

## TABLE OF CONTENTS

STATEMENT OF THE ISSUE ................................................................1

STATEMENT OF THE CASE ...............................................................1

A. Alternate Solutions Health Network, LLC and Inova Health System, LLC Enter a Joint Venture, Creating Inova Home Health, LLC and Hire Tartaro-McGowan as a Clinical Manager. ...................................................1

B. Inova Home Health Required Tartaro-McGowan to Perform Direct Patient Care as Part of Her Essential Duties. .................................................2

C. COVID-19 Strikes, Causing Inova to Require Office Personnel to Perform Field Visits. ...............................................................................6

D. Tartaro-McGowan Asks to be Excused from Field Visits. ...........................8

E. Screening Patients Allowed Tartaro-McGowan to Perform Her Job Duties Consistent with Her Medical Needs. ..............................................13

F. Tartaro-McGowan Refuses to Perform a Field Visit, Abandoning Her Position. ..............................................................................15

G. Inova Home Health Did Not Treat Any Similarly Situated Employees More Favorably than Tartaro-McGowan ...............................................17

H. Defendants Moved for Summary Judgment, and the Court Granted their Motion in its Entirety ...............................................................19

**SUMMARY OF THE ARGUMENT** ...................................................................**21**

**ARGUMENT** ....................................................................................................**23**

**A.  Standard of Review and Summary Judgment Standard.** .........................**23**

**B.  The District Court Properly Dismissed Tartaro-McGowan's Claim for Failure to Accommodate Under the ADA.** ...............................................**24**

    **1.  Elements.**..............................................................................................**24**

    **2.  Tartaro-McGowan's claim for failure to accommodate fails because performing field visits was an essential function of her job.**...................**25**

    **3.  Tartaro-McGowan's claim for failure to accommodate fails because Defendants offered her reasonable accommodations, which she refused.**............**32**

    **4.  Tartaro-McGowan was also unqualified for her position because she could not meet the physical requirements of her position.**......................**36**

**C.  The *McDonnell-Douglas* Burden Shifting Framework.** .........................**37**

**D.  The District Court Properly Dismissed Tartaro-McGowan's Claim for Disability Discrimination.** .....................................................................**38**

    **1.  Elements of a *prima facie* case.**...........................................................**38**

    **2.  Tartaro-McGowan's claim for disability discrimination fails because Tartaro-McGowan cannot establish any element of her *prima facie* case.**...........**39**

    **3.  If Tartaro-McGowan can establish that Defendants took an adverse employment action, her claim fails because Defendants had a legitimate, non-discriminatory reason to terminate her employment.** ...................**41**

    **4.  Tartaro-McGowan cannot establish that Defendants' legitimate, non-discriminatory reason to terminate her employment was a pretext for unlawful discrimination.** ......................................................................**42**

**E.  The District Court Properly Dismissed Tartaro-McGowan's Claim for Retaliation.** ......................................................................................**46**

**F.  The District Court Appropriately Dismissed Tartaro-McGowan's Age Discrimination Claim.**........................................................................**47**

**CONCLUSION** ................................................................................................**49**

## **TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*Adams v. Anne Arundul Cnty. Pub. Schs.*,
    789 F.3d 422 (4th Cir. 2015) ........................................................................32

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................24

*Andrews v. Commonwealth of Virginia*,
    232 F.3d 886 (4th Cir. 2000) ........................................................................32

*Boone v. Board of Governors of Univ. of N. Carolina*,
    858 F. App'x 622 (4th Cir. 2021) ...............................................................31

*Boyer-Liberto v. Fontainebleau Corp.*,
    786 F.3d 264 (4th Cir. 2015) ........................................................................46

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................24

*Concord Crossroads, LLC v. Human Capital Resources and Concepts, Inc.*,
    E.D. Va. No. 1:20-cv-0589, 2021 WL 5323693 (Nov. 16, 2021) ...........24

*Cook v. United Parcel Service, Inc.*,
    4th Cir. No. 21-1693, 2022 WL 1090251 ...............................................31

*Elledge v. Lowe's Home Centers, LLC*,
    979 F.3d 1004 (4th Cir. 2020) ................................................... *passim*

*Hannah P. v. Coats*,
    916 F.3d 327 (4th Cir. 2019) ...................................................................33, 34

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
    790 F.3d 532 (4th Cir. 2015) ........................................................................24

*Jacobs v. N.C. Admin. Office of the Courts*,
    780 F.3d 562 (4th Cir. 2015) ........................................................................32

*Laird v. Fairfax Cnty. Virginia*,
    978 F.3d 887 (4th Cir. 2020) ........................................................................37

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................24

*McDonnell Douglas v. Green*,
    411 U.S. 792 (1973).................................................................................37, 38

*Mereish v. Walker*,
   359 F.3d 330 (4th Cir. 2004) ..................................................................43

*Perry v. Computer Sciences Corp.*,
   429 F.App'x. 218 (4th Cir. 2011) ..........................................................37

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000) ...............................................................................38

*Reyazuddin v. Montgomery Cnty.*,
   789 F.3d 407 (4th Cir. 2015) ..................................................................32

*Reynolds v. Am. Nat. Red Cross*,
   701 F.3d 143 (4th Cir. 2012) .......................................................38, 40, 42

*Russell v. Microdyne Corp.*,
   65 F.3d 1229 (4th Cir. 1995) ..................................................................42

*Shin v. Univ. of Maryland Med. Sys. Corp.*,
   369 F. App'x 472 (4th Cir. 2010) ....................................................34, 35

*Spencer v. Virginia State Univ.*,
   919 F.3d 199 (4th Cir. 2019) ..................................................................45

*Talley v. Family Dollar Stores of Ohio*,
   542 F.3d 1099 (6th Cir. 2008) ................................................................32

*United States v. 8.929 Acres of Land in Arlington County*,
   36 F.4th 240 (4th Cir. 2022). Civil ........................................................23

*United Supreme Council, 33 Degree of the Ancient and Accepted Scottish Rite of
   Freemasonry Prince Hall Affiliation, Southern Jurisdiction of the United
   States of America, a Tennessee Non-Profit Corporation v. United Supreme
   Council of the Ancient and Accepted Scottish Rite of Freemasonry Prince Hall
   Affiliated, a District of Columbia Non-Profit Corporation*,
   792 F.App'x 249 (4th Cir. 2019) ....................................................47, 48

*Villa v. CavaMezze Grill, LLC*,
   858 F.3d 896 (4th Cir. 2017) ..................................................................43

*Westmoreland v. TWC Admin. LLC*,
   924 F.3d 718 (4th Cir. 2019) .........................................................37, 38, 48, 49

*Wilson v. Dollar General Corp.*,
   717 F.3d 337 (4th Cir. 2013) ..................................................................25

*Wilson v. Dollar General Corp.*,
   717 F.3d 345 (4th Cir. 2013) ..................................................................32

iv

*Yochim v. Carson*,
    935 F.3d 586 (7th Cir. 2019) ..............................................................35, 36

**Statutes**

42 U.S.C. § 12111(8) .........................................................................................26

ADA ............................................................................................................ *passim*

ADEA ..................................................................................................................37

**Other Authorities**

29 C.F.R. § 1630.02(n)(3)(i)-(vii) .....................................................................26

29 C.F.R. § 1630.2(o) ........................................................................................35

29 C.F.R. § 1630.02(o)(1)(ii) .............................................................................31

## STATEMENT OF THE ISSUE

Whether the district court properly granted summary judgment when the undisputed facts demonstrate that Defendants were entitled to judgment as a matter of law.

## STATEMENT OF THE CASE

**A. Alternate Solutions Health Network, LLC and Inova Health System, LLC Enter a Joint Venture, Creating Inova Home Health, LLC and Hire Tartaro-McGowan as a Clinical Manager.**

On September 5, 2018, Inova Health System and Alternate Solutions Health Network, LLC ("ASHN") entered a joint venture, creating Inova Home Health, LLC ("Inova Home Health"). JA106. (ASHN and Inova Home Health are referred to collectively as "Defendants.") At that time, Inova Health System ceased to operate a home health agency, and Inova Home Health began providing many of the home health services Inova Health System previously offered. *Id.* During the transition, ASHN interviewed Tartaro-McGowan and offered her a position as a clinical manager with Inova Home Health. JA106-107; JA134; JA314. Tartaro-McGowan accepted the clinical manager position and began working on September 5, 2018. *Id.* Tartaro-McGowan tries to imply that she was a long-term employee of Inova Health System (a non-party), but the Defendants in this action had no affiliation with Tartaro-McGowan until September 2018—less than two years before her employment ended. *Id.*; *see* Tartaro-McGowan Br. at 5.

The clinical manager job description makes clear that employees must be able to meet certain physical requirements to be qualified for the position, including, in relevant part:

- Bending occasionally (2%-33% of the time);

- Lifting up to 50 lbs. with or without assistance occasionally (2%-33% of the time); and

- Stooping (bend at waist) occasionally (2%-33% of the time).

JA317; *see also* JA138. Tartaro-McGowan testified that she was able to perform the other physical demands of her position, but she admits that she could not fulfill the bending, lifting, or stooping requirements of the clinical manager position. JA161-162; JA167-169.

## B. Inova Home Health Required Tartaro-McGowan to Perform Direct Patient Care as Part of Her Essential Duties.

According to the job description, clinical managers perform a number of tasks in the office, conduct supervisory field visits, and perform direct patient care field visits as needed. *See* JA315-316. Supervisory field visits differ from direct care field visits in that a clinical manager's primary duty is to observe another clinician providing the care during a supervisory field visit. JA143; JA398. Even so, to perform a supervisory field visit, the clinical manager must go to the part of a patient's home where the care is being provided. JA147. Tartaro-McGowan admits that, on at least one occasion shortly before the COVID-19 pandemic, she performed

2

direct patient care on a supervisory field visit. JA124. During that visit, the clinician

being supervised was unable to draw a patient's blood:

> Q:    …So why don't you tell me what you believe any limits you have to performing your job duties?
>
> A:    Well, prior to the pandemic I was not asked to do direct patient care visits. I went out into the field and did supervisory visits. I—
>
> Q:    And when you were doing—I'm sorry, Laura. When you were doing supervisory visits prior to the pandemic, isn't it true that you also performed blood draws and things like that when you had someone else there with you?
>
> A:    I performed one blood draw during that time period.
>
> Q:    And that was right before the pandemic?
>
> A:    I don't recall what day it was, but it was teaching another nurse how to properly draw blood.
>
> Q:    And you—
>
> A:    She could not get it.
>
> Q:    And you were able to complete the task?
>
> A:    Yes, I was.

JA124; *see also* JA144 (estimating that Tartaro-McGowan performed 10-15

supervisory field visits before the COVID-19 pandemic).

While internal office staff did not regularly perform direct care patient visits

prior to the COVID-19 pandemic, Defendants unequivocally considered such visits

an essential function of the clinical manager position. JA316; JA385; JA387 ("But

3

another part of their job is if there is not adequate staffing or if there is a patient need that arises before we can get a staff member to cover the patient, her job was to go, as patient care is all—it was all of their primary responsibilities."); JA437; JA442-443; JA445; JA515. During the training process, Jolita Humphrey and Star Lyons made it clear to Tartaro-McGowan that clinical managers may be required to go into the field to perform direct care field visits depending on operational needs.[1] JA385-386; JA535-536. As Kathleen Nesterick testified with regard to the COVID-19 pandemic:

> Q:    I'm just wondering how important was it to get internal staff out into the field?
>
> A:    It was important. We had patients that needed visits.

JA445; *see also* JA518 ("[T]he current need and the unprecedented time was really driving the requirement to do patient visits.").

---

[1] Tartaro-McGowan's brief claims that Jolita Humphrey and Billie Ellis told Tartaro-McGowan "that she would not be required to go into the field to provide direct patient care in her role as a Clinical Manager for Inova," but the record says otherwise. *See* Tartaro-McGowan Br. at 6. Indeed, Tartaro-McGowan admits, in the very pages she cites, that "Jolita and Billie Ellis told her that such visits are "very infrequent," not that they would not be required. JA163. Tartaro-McGowan's Brief also claims that she was made this promise and issued a "new job description." *See* Tartaro-McGowan Br. at 10. The record does not contain a "new job description." The only job description *Defendants* gave Tartaro-McGowan is the one that lists patient care visits as an essential function. *See* JA315-317. Indeed, that is the only job description in the record.

The clinical manager job description lists as the first essential job function, "Arrives at assigned location on scheduled work day. Works according to designated hours and ***on-call as needed in office and field nursing responsibilities***." JA158-159; JA316 (emphasis added). The job description also lists as a "Major Area of Responsibility," "Completes field visits as needed providing direct patient care upon Administrator discretion." *Id.* Tartaro-McGowan admits that she received a copy of this job description. JA138.

Tartaro-McGowan points out that Defendants trained Inova Home Health employees on two sets of software: one for internal staff and one for field clinicians. Tartaro-McGowan Br. at 7. While this was true initially, Inova Home Health spent a full week training internal office staff on how to use the software available to field clinicians shortly after it informed them that they would be required to perform field visits. JA578-579; JA537-538. Further, at all times, internal staff were capable of performing a "paper visit" that could later be uploaded into the patients' medical records. JA390; JA537-538.

Inova Home Health requires its internal office staff, including clinical managers, to maintain CPR certification and to meet yearly competencies. JA096; JA536-537. These competencies included, "How to take a blood pressure correctly, how to draw blood correctly, How to start an IV. Drips, if you needed to know drips for in the ICU or in the telemetry units." JA096-097; *see also* JA318-327; JA190-

191. According to Tartaro-McGowan, Inova Home Health requires yearly competency training, "To make sure you're competent to perform your duties." JA098. Tartaro-McGowan agreed that it was reasonable for Inova Home Health to require such training for her position. JA099. Tartaro-McGowan's last CPR training took place in February of 2020. JA118.

## C.  COVID-19 Strikes, Causing Inova to Require Office Personnel to Perform Field Visits.

The COVID-19 pandemic arrived in the United States in Spring 2020 and caused almost immediate and significant operational disruptions for Inova Home Health. JA230-231. A significant number of field clinicians resigned to avoid treating patients who had contracted COVID-19. JA586-587; JA646-647 ("Throughout the pandemic, we saw increased turnover related to our clinicians in the field. It created challenges for patient care."). Other clinicians left due to pandemic-induced childcare issues. JA586. As a result of the staffing shortage, Inova Home Health had to find additional clinicians just to cover the field visits their patients required. JA584 (noting that internal staff were not used when the pandemic began until Inova Home Health began to lose nurses); JA650-651; JA218-219. As Tartaro-McGowan admits, "Patient care is the number one goal." JA184.

To meet patient needs, Inova Home Health first sent its two preceptors into the field to perform direct care field visits. JA219; s*ee also* JA328-329. On May 4, 2020, Inova Home Health informed its internal office staff that they would be

6

required to perform field visits until it could hire additional nurses to meet patient

needs:

> So it changed because we now had lost several of our nursing staff and
> we had patients who needed visits. So our corporate leaders had asked
> everyone in the office, including our field administrator, to assist with
> seeing patients in the field. They had a conversation with us, explained
> that it was part of our job description. And that as nurses, that we
> already possessed the skills. We are annually—you know, we had
> already been annually comped for all of the skills out in the field to
> return [sic] demonstrate that we have those abilities to do it. And they
> had basically allowed us to self-select our patients.

JA568-569.

These internal staff included clinical field staff liaisons, the clinical managers

to whom they reported, the director of nursing, and the field administrator to whom

all Inova Home Health employees ultimately reported. JA569; JA426. ASHN even

sent three employees from its Dayton, Ohio headquarters to Northern Virginia to

cover patient visits:

> Q:     What was your understanding why they were put out into the
>        field?
>
> A:     Because we needed assistance with some field visits.
>
> Q:     And was that in relation to a shortage of staff?
>
> A:     Oh, let's see. Andy is a trainer. Maria is a trainer. I would say
>        yes, it was due to a staffing issue, yes.
>
> Q:     And was it also related to the pandemic, COVID-19?
>
> A:     Well, you said this was sent May 12th; is that correct?

Q:     Yes.

A:     So I would say this was the beginning of the pandemic discussions.

JA217-218; JA771; *see also* JA328-329. While the internal office staff were performing field visits, internal staff at ASHN's Dayton headquarters covered the administrative functions that Inova Home Health employees could not perform as a result of their field duties.

**D.     Tartaro-McGowan Asks to be Excused from Field Visits.**

Many of the internal office staff, including Tartaro-McGowan, resisted the directive that they perform field visits. JA601; JA446. For example, Tartaro-McGowan expressed concerns about contracting COVID-19. JA115-116. As Tartaro-McGowan testified:

Q:     …When you were working during the pandemic, did the pandemic cause you any concerns about working in the workplace?

A:     Yes.

Q:     What type of concerns did you have?

A:     My concerns were for my patients, for my staff, and for the internal staff.

Q:     Were you also concerned about yourself or your husband given his condition?

A:     Absolutely.

JA114-115.[2]  On  May  13,  2020,  Tartaro-McGowan  emailed  ASHN's  human

resources  department  requesting  an  accommodation  for  her  alleged  disability,

arthritis in her knees. JA338-340; JA222-224.

On May 15, 2020, Director of Human Resources Joan VanZant responded to

Tartaro-McGowan's request, stating:

> We are in receipt of your note requesting a reasonable accommodation
> for your disability of chronic arthritis by avoiding stress to your knees
> or lower extremities. ***We are not able to accommodate your request to
> eliminate field visits altogether but will support you screening
> patients/visits so you can participate in selecting field visits, helping
> to avoid the need to squat and bend your knees. We can also
> accommodate a schedule during the week so that visits are not being
> completed back to back. Rather we could spread them out during the
> week as much as possible.***

JA337-338 (emphasis added); JA228-229; *see also* JA498-499. Tartaro-McGowan

then  produced  a  note  from  her  primary  physician,  Dr.  Gavora,  stating,  "I  would

therefore respectfully request that she be employed in a different capacity which will

not require her to bend her knees or otherwise put stress on her lower extremities."

JA341; JA236. The only restrictions Dr. Gavora noted were that Tartaro-McGowan

was not to "squat or get very low, bend her knees or otherwise put stress on her lower

extremities." JA239-240. Tartaro-McGowan further testified:

> Q:     And you testified quite extensively here today that a lot of the
>        duties out in the field can be met be either sitting, standing or
>        doing one of those other tasks that are not prohibited by Dr.
>        Gavora, correct?

---

[2] Tartaro-McGowan was the caregiver for her husband. JA299-300.

9

A:     Yes.

JA242. When Tartaro-McGowan did not get the accommodation she wanted, she sought and received a second note from Dr. Gavora. *See* JA342. In that note, Dr. Gavora did not alter Tartaro-McGowan's job restrictions in any way; he only stated, "I do not think this is a reasonable solution." *See* JA342; JA244-245. At no point did Dr. Gavora suggest that Tartaro-McGowan should leave her employment for health-related reasons—despite knowing that she was expected to perform direct care patient visits. JA249.

On June 5, 2020, Field Administrator Kathleen Nesterick responded to the notes from Tartaro-McGowan's physician, stating:

> We are in receipt of your physician letter from Dr. Gavora. I appreciate your concern related to your ability to make field visits. ***We have offered to allow you to select appropriate visits that would greatly reduce the possibility of injury.*** Your 17+ years of field experience gives you an additional advantage of knowing how to properly screen patients. Selecting the 48 hr. lab/transplant patients would be an example of the type of visit that you would make. These patients are not homebound and are able to move about. ***We want to work with you, and are therefore asking what form of additional accommodation, other than not going into the field (which is an essential function of your position), are you requesting?***

JA347 (emphasis added); JA255-256. Tartaro-McGowan responded by continuing to insist that she not be required to perform direct patient care field visits and by refusing to agree to any accommodation other than that which she originally requested:

> Q:     …Anywhere in this response that you suggested any other alternate accommodation of the employer?
>
> A:     No, it does not.

JA261; JA346; *see also* JA439. Tartaro-McGowan suggested that the layout of a patient's home, the location of their care, and the theoretical possibility of a negative reaction to treatment prevented her from performing any patient visits. *See* JA346. She further admitted that she was refusing to go into the field to provide direct patient care as requested by the Company:

> Q:     Right, and you're affirmatively stating that you're not going to see patients in the field by providing direct care, correct?
>
> A:     It says I'm not willing to take the risk, so I would say—
>
> Q:     Correct?
>
> A:     --yes.

JA262.

On June 12, 2020, Ms. Nesterick responded to Tartaro-McGowan's blatant refusal to perform an essential function of her job, again asking her to perform field visits Inova Home Health needed covered:

> We received your email requesting some type of accommodation. ***As you know, we have offered the accommodation that you can choose which patients to visit so as to avoid physical type challenges you may foresee. Field visits have always been part of the clinical manager description and an essential job function.*** Additionally, in light of the pandemic and staffing challenges our agency has faced as a result, all internal staff have been asked to assist with field visits in order to support our patients and fellow clinicians.

11

> ***As field visits are considered an essential job function and an expectation, I am asking for notification from you before next Friday, June 19, that you will be assisting with field visits of your choosing.*** If this is not feasible, you would be considered unable to perform the function of the job, and we would proceed accordingly.

JA349 (emphasis added); JA263-264. On June 18, 2020, Tartaro-McGowan responded, refusing to engage further in the interactive process, but stubbornly insisting that her preferred accommodation was "not unduly burdensome" to Inova Home Health and that they were not "responsive to [her] medical needs." JA348-349. Again, she offered no alternative accommodations other than the preferred accommodation she initially requested. *See id.*

With the continuing need to perform patient visits and Tartaro-McGowan's outright refusal to suggest any alternative accommodations, Ms. Nesterick delivered a final warning on June 22, 2020:

> I am in receipt of your response. ***As you know from my prior emails, field visits are an essential job function.*** It is especially important at this time, to provide needed care to our patients as well as offer support to your fellow clinicians. While the volume of patients requiring visits may fluctuate, the function of providing field visits is part of a clinical manager's job description. The newly hired staff are at various stages of onboarding and training. They are not yet able to offer the full productivity assistance needed at this time, which is why our internal team is assisting with patient care. ***As you know from prior communication, you were offered the accommodation of choosing which patients to visit so as to avoid physical type challenges you may foresee.***
>
> ***I do need to inform you that this is your final warning. I expect that you will be available to see patients in the field beginning Wednesday***

*June 24th. If you decide not to go into the field, then this will be considered job abandonment, and you will no longer be employed by Inova Home Health effective June 24th.*

JA352 (emphasis added); JA197; JA472.

By reviewing a patient's electronic medical records, Tartaro-McGowan could assess the patient's needs, determine if any special equipment was required to perform the required care, and review a patient's limitations. JA151-153; *see also* JA571-572. Tartaro-McGowan could also contact her own clinical staff to help select visits that met her alleged limitations. JA437-438; *see also* JA149. Selecting visits allowed Tartaro-McGowan to select only those visits where she felt able to perform the tasks required by the patient. *See* JA352. She could avoid start-of-care visits, so patient's records would reveal any challenges presented by the patient's home or the location where care was provided, and any clinicians that previously saw the patient could discuss unique challenges presented by the patient's home. JA200-201; JA571-572 (noting that the documentation shows how many steps are required to enter a home, access a bedroom, and access a bathroom); JA437-438.

### E. Screening Patients Allowed Tartaro-McGowan to Perform Her Job Duties Consistent with Her Medical Needs.

While Tartaro-McGowan's physician suggested that she could not perform any bending, squatting, or kneeling, Tartaro-McGowan suggested that she was able to perform many of the functions she sought to avoid. For example, Tartaro-McGowan resides in a split level home, where she estimates that she goes up and

13

down the stairs five to six times per day. JA089-090. She also attends approximately 40 Washington Nationals games per year, which requires her to go up and down steps. JA108-109. She performs household chores such as laundry, grocery shopping, cleaning, taking out trash, walking her two dogs for 35 minutes a day, and caring for her husband. JA111-112. During her CPR training, Tartaro-McGowan had to lean over to demonstrate her CPR skills on a mannequin. JA120-121.

Even if Tartaro-McGowan could not perform every patient visit, she testified that she could perform many tasks sitting or standing, and without bending, squatting, or kneeling. JA131-132, JA207 (drawing blood); JA198 (inserting a catheter); JA198-199 (setting up a CADD Prizm pump); JA203-204 (wound care, depending on the location of the wound); JA210 (medication reviews). When Tartaro-McGowan's capabilities were brought to her attention, she shifted to focusing on the hypothetical possibility that a patient might have an *unexpected* reaction to treatment provided. *See* JA246. However, Tartaro-McGowan testified that she could call 9-1-1, ask a family member for assistance, or call the agency for further assistance if a patient reacted negatively to treatment. JA311; *see also* JA502. Tartaro-McGowan admits that she has had to call 9-1-1 in the past. *See* JA783.

While Tartaro-McGowan asserted that the "layout of a patient's home" was one of the major reasons she could not perform field visits, she admits that she "[D]idn't think about it" before going on supervisory field visits prior to the

14

pandemic. JA129, *see also* JA147-148. If the layout of a patient's home was a concern, Tartaro-McGowan could have reviewed such information in the patient's chart or asked one of the clinicians who had previously treated the patient. JA148 (explaining that clinicians who admit patients document the layout of a patient's home in a computer system); JA149 (indicating that clinicians informed Tartaro-McGowan of issues regarding the layout of a patient's home); *see also* JA227-228. Certainly there is no difference between navigating a patient's home to provide care and navigating a patient's home to watch someone else provide care, yet Tartaro-McGowan only complains about the former.

**F.**    **Tartaro-McGowan Refuses to Perform a Field Visit, Abandoning Her Position.**

June 24, 2020 came and passed, and Tartaro-McGowan did not perform any field visits:

> Q:    As of June 24th, 2020, you did not go into the field to perform any direct patient care site visits, correct?
>
> A:    That's correct.

JA280; *see also* JA472; JA662 (describing the reason for termination as "a refusal to go out and complete home visits for patient care"). Acknowledging that she had missed the deadline, Tartaro-McGowan emailed Ms. Nesterick on June 25, 2020, asking for clarification regarding her employment status. JA353-354; JA275-276. Ms. Nesterick responded, "This communication confirms that you did not make any

field visits on Wednesday June 24th as requested and also had cleared out your office as of Tuesday June 23. You have effectively abandoned your job and your last day of employment, as per my prior email, was Wednesday June 24th." JA355; JA281-282; *see also* JA475-476.

Tartaro-McGowan implies that she would have performed a direct care visit but for the alleged cancellation of the visit she was scheduled to take on June 24, 2022. *See* Tartaro-McGowan Br. at 11-12. This, of course, is a red herring. Tartaro-McGowan admits that she cleared her personal belongings out of her office on June 23, 2020, the day before her deadline to perform a visit. JA283-284. Tartaro-McGowan admits that she did not even "try to pick up another patient on the 24th to go out into the field." JA279. Most tellingly, Tartaro-McGowan testified that she would refuse any job that required her to perform patient field visits. JA302 ("I would refuse accepting that job, correct."). Reading the evidence in the light most favorable to Tartaro-McGowan, the district court correctly concluded that Tartaro-McGowan had failed to meet the requirement of completing a single patient visit by June 24, 2020, and that the patient's alleged request to reschedule the appointment was immaterial.

Tartaro-McGowan was not able to identify any individuals that replaced her, and there was no other evidence in the record suggesting that Tartaro-McGowan was replaced by anyone outside her alleged protected classes. JA308; *see also* JA660

16

(explaining that internal staff covered Tartaro-McGowan's job duties until the end of 2020). Tartaro-McGowan speculates that Inova Home Health attempted to replace her before her employment ended, but it was undisputed that Inova Home Health was growing and continuously recruiting for all positions. *See* Tartaro-McGowan Br. at 9; *see also, e.g.*, JA655; JA659. Even if Tartaro-McGowan could establish that Inova Home Health attempted to get a head start on replacing her, that would not establish that Inova Home Health was motivated by Tartaro-McGowan's disability, request for an accommodation, or age.

Tartaro-McGowan admits that no employees of Inova Home Health or ASHN made disparaging comments about her age or her alleged disability. JA308-309. She also could not identify any employees that made disparaging comments about her request for an accommodation or her EEOC charge. JA309-310.

## G.   Inova Home Health Did Not Treat Any Similarly Situated Employees More Favorably than Tartaro-McGowan.

Only Tartaro-McGowan and one clinical field staff liaison refused to perform field visits, and Inova Home Health considered both to have abandoned their positions after failing to perform a visit by a set deadline.[3] *See* JA273. All other internal office staff performed the direct care field visits they were asked to perform. *See* JA328-329 (preceptors Amy Sahm and Anne Anastacio); JA356-370 (Sarah

---

[3] Emma Marshall and Tartaro-McGowan retained the same counsel prior to refusing to perform direct care patient visits.

McClain, Cassandra Odom, Virginia Vasquez, Tifanni White, and Deidra Witherspoon). Only one other internal office employee held the title of clinical manager, Deidra Witherspoon, and she performed the field visits she was required to perform. JA268-269; JA570; *see also* JA356-370. One employee was even disciplined for failure to complete enough field visits. JA590; *see also* JA508. Tartaro-McGowan alleges that three additional employees did not have to perform field visits, but all three were remote workers, and none of them even held the position of clinical manager. JA602-605; JA461-463; *see* JA267. The individuals that Tartaro-McGowan identified as internal office employees—Cassandra Odom, Sarah McClain, Deidra Witherspoon, Virginia Vasquez, and Kathleen Nesterick— all performed field visits. JA268; JA305-307; JA356-370.

Tartaro-McGowan alleges that the direct care patient visit requirement was subsequently eliminated, but it is undisputed that all internal office staff were required to perform such visits at the time Inova Home Health required Tartaro-McGowan to perform such visits. JA268; JA305-307; JA356-370. It is irrelevant that the subsequent resolution of the staffing shortage might have eliminated this requirement for Tartaro-McGowan at some point in the future.

**H.    Defendants Moved for Summary Judgment, and the Court Granted their Motion in its Entirety.**

On November 29, 2021, Defendants moved for summary judgment as to all four counts in Tartaro-McGowan's Complaint. JA044-078. Tartaro-McGowan opposed Defendants' Motion for Summary Judgment as it pertained to her claims under the Americans with Disabilities Act claims but declined to oppose Defendants' Motion as it related to her age discrimination claim. JA672-706. On June 21, 2022 and after the parties had fully briefed all issues, the district court issued a Memorandum Opinion and Order granting Defendants' Motion for Summary Judgment in its entirety. JA009-031.

The district court dismissed Tartaro-McGowan's age discrimination claim because Tartaro-McGowan abandoned that claim by failing to oppose Defendants' Motion. JA015.

With regard to Tartaro-McGowan's claim for failure to accommodate under the Americans with Disabilities Act, the district court concluded that direct care patient visits were an essential function of Tartaro-McGowan's job because five of the seven relevant factors favored such a finding, whereas only one would have resulted in a finding that such visits were not an essential function. JA017-020. Because the only accommodation Tartaro-McGowan was willing to consider was the elimination of an essential function, her request was unreasonable as a matter of law. JA020. Furthermore, Tartaro-McGowan admitted that she could not meet the

physical requirements of her job, which the district court concluded made her unqualified for her position. JA020-021. Tartaro-McGowan's Brief characterizes this as the end of the district court's analysis, but that ignores the district court's finding that Defendants *did* offer Tartaro-McGowan a reasonable accommodation, which she refused. JA021-022. In short, regardless of whether direct care patient visits were an essential function of Tartaro-McGowan's position, Tartaro-McGowan's insistence on her preferred accommodation doomed her failure to accommodate claim. JA021-023.

With regard to Tartaro-McGowan's disability discrimination claim, the district court concluded that her claim failed on three of the four elements of her *prima facie* case, any one of which is sufficient to defeat her claim. JA025-026. The district court concluded that Tartaro-McGowan was not qualified for her position because she allegedly could not perform an essential function of her job, that she failed to meet Defendants' expectations that all internal field staff help care for patients in a staffing shortage, and that she could not identify any circumstances suggesting that Defendants were hostile to her because of her alleged disability. *Id.* The district court further concluded that Defendants had a non-pretextual, legitimate, non-discriminatory reason to terminate Tartaro-McGowan's employment—her refusal to complete a patient visit by a set deadline. JA026-027.

Finally, with regard to Tartaro-McGowan's retaliation claim, the district court concluded that Tartaro-McGowan had established the elements of a *prima facie* case, but it concluded that Defendants had a non-pretextual, legitimate, non-retaliatory reason to terminate Tartaro-McGowan's employment. JA028-030. The district court ultimately concluded:

> [N]o reasonable factfinder could conclude that Defendants, who faced a difficult staffing situation in the early months of the COVID-19 pandemic, retaliated against Plaintiff for requesting a reasonable accommodation under the ADA. Instead, it was Plaintiff's refusal to perform field visits at all that caused Defendants to end her employment.

JA030. The district court analyzed the undisputed facts and the applicable law correctly. Its decision should be affirmed.

## SUMMARY OF THE ARGUMENT

Defendants had a legitimate, non-discriminatory, non-retaliatory, and non-pretextual reason to terminate Tartaro-McGowan's employment—after multiple warnings, she refused to perform a direct care patient visit in the early stages of the COVID-19 pandemic, when Inova Home Health was experiencing a severe staffing shortage. Tartaro-McGowan accuses Defendants of failing to provide her with a reasonable accommodation for her alleged disability, discriminating against her because of her disability, and retaliating against her for requesting a reasonable accommodation.

Allegedly because her knees interfered with significant life activities, Tartaro-McGowan requested an accommodation in the form of not performing direct care patient visits. This accommodation was unreasonable as a matter of law because direct care patient visits were an essential function of Tartaro-McGowan's position. In other words, Defendants had no obligation to eliminate direct care patient visits from her job duties, and Tartaro-McGowan was not qualified for her position because, as she contends, she was unable to perform an essential function of her position.

While the analysis could end there, Defendants went out of their way to work with Tartaro-McGowan. They engaged in the interactive process and offered her two reasonable accommodations—she could screen patient visits so that they would not interfere with her medical restrictions, and she could space out her appointments so that she did not have back-to-back stress on her knees. Tartaro-McGowan, however, insisted that she be given her preferred accommodation, rejecting the reasonable accommodation offered by Defendants. This, again, rendered her unqualified for her position, eliminating her reasonable accommodation and disability discrimination claims. Further, Tartaro-McGowan admitted that she could not meet the physical requirements for her position, rendering her unqualified for yet another reason.

Finally, Tartaro-McGowan failed to meet her employer's legitimate expectation that she perform field visits to ease the pressures of a staffing shortage

coupled with a global pandemic, dealing another blow to her *prima facie* case of disability discrimination. Contrary to Tartaro-McGowan's accusations, the undisputed facts show that Inova Home Health universally required all internal office staff to perform patient visits and that it terminated the only two internal office staff who outright refused to perform this essential function of their job. Defendants went out of their way to accommodate Tartaro-McGowan, but Tartaro-McGowan would accept nothing less than her initial demand that she be excused from an essential function. The law does not require Defendants to cower to Tartaro-McGowan's demands when they offer a reasonable accommodation, and it is beyond dispute that Defendants were entirely without a legal obligation to eliminate one of Tartaro-McGowan's essential job functions. Tartaro-McGowan's stubborn refusal to perform her job resulted in her termination, and the Court should affirm the district court's order concluding the same.

## ARGUMENT

### A.     Standard of Review and Summary Judgment Standard.

This Court reviews a district court's order granting summary judgment *de novo*, "applying the same legal standards as the district court." *United States v. 8.929 Acres of Land in Arlington County*, 36 F.4th 240, 252 (4th Cir. 2022).  Civil Rule 56(a) provides, "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." "A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Concord Crossroads, LLC v. Human Capital Resources and Concepts, Inc.*, E.D. Va. No. 1:20-cv-0589, 2021 WL 5323693 (Nov. 16, 2021) (citations omitted).

Defendants bear the "initial burden" of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Tartaro-McGowan bears the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To meet that burden, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## B.    The District Court Properly Dismissed Tartaro-McGowan's Claim for Failure to Accommodate Under the ADA.

### 1.    Elements.

To establish a failure to accommodate claim under the Americans with Disabilities Act, Tartaro-McGowan must prove "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice

of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position…and (4) that the [employer] refused to make such accommodations. *Wilson v. Dollar General Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citation omitted). For purposes of summary judgment only, the Defendants did not contest the first two elements of Tartaro-McGowan's failure to accommodate claim. However, Tartaro-McGowan's claim fails because she refused to perform an essential function of her position. Separately—and regardless of whether this Court agrees with the district court that patient visits were an essential function of Tartaro-McGowan's job—her claim fails because Defendants offered her a reasonable accommodation that she refused.

**2.      Tartaro-McGowan's claim for failure to accommodate fails because performing field visits was an essential function of her job.**

Tartaro-McGowan's claim for failure to accommodate fails because she requested an accommodation in the form of elimination of an essential job function. A job function is essential if it "bears more than a marginal relationship to the job at issue." *Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020) (citations omitted). The regulations implementing the ADA provide a non-exhaustive list of factors to consider in determining whether a job function is essential, including:

1.  The employer's judgment as to which functions are essential;

2. Written job descriptions prepared before advertising or interviewing applicants for the job;

3. The amount of time spent on the job performing the function;

4. The consequences of not requiring the incumbent to perform the function;

5. The terms of a collective bargaining agreement;

6. The work experience of past incumbents in the job; and/or

7. The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.02(n)(3)(i)-(vii).

Tartaro-McGowan was not subject to a collective bargaining agreement, but the remaining factors all favor a finding that patient care field visits are an essential job function of a clinical manager at Inova Home Health.

The first and most important factor weighs in favor of finding that direct care patient visits were an essential function of Tartaro-McGowan's position. According to the ADA itself, "consideration *shall* be given to the employer's judgment." 42 U.S.C. § 12111(8) (emphasis added). "As is attested in the law of other circuits, the decision about a position's essential functions belongs, in the first instance, to the employer; it accordingly merits 'considerable deference' from the courts. *Elledge*, 979 F.3d at 1009 (collecting cases). Multiple management witnesses testified that they considered direct care visits an essential function of a clinical manager's position. *See, e.g.*, JA385; JA387; JA437; JA442; JA445; JA515; JA666. Even

Tartaro-McGowan admitted that patient care was Inova Home Health's priority. JA184. Tartaro-McGowan complains that Defendants' witnesses did not explain why they considered direct care field visits an essential function to her satisfaction, but it is the employer's perspective that matters, not the plaintiff's satisfaction with their explanation. Tartaro-McGowan's remaining arguments actually address Factor No. 3, not Defendants' judgment about what constitutes an essential function. The district court agreed that this factor weighed in favor of finding that such visits were an essential function of Tartaro-McGowan's position. JA017.

Second, Tartaro-McGowan's job description lists performing field visits as an essential function, as well as a "Major Area of Responsibility." JA316. To be clear—"field nursing responsibilities" is expressly listed as an "essential function" in Tartaro-McGowan's job description. *Id.* In fact, it is the first essential function. *Id.* Tartaro-McGowan goes to great lengths to split hairs about the wording of this job function under the "essential function" and "Major Area of Responsibility" labels, but nothing in her job description suggests that "essential functions" and "Major Areas of Responsibility" are mutually exclusive. *See* Tartaro-McGowan Br. at 21-23. Tartaro-McGowan does not identify any admissible evidence suggesting that they are mutually exclusive; she has only her lawyer's argument. Tartaro-McGowan bears the burden of production—of evidence. Indeed, the text of the job description makes clear that performing direct care patient visits is both a Major Area of

Responsibility *and* an essential function of her job. This applies to other qualifications, too. For example, "Maintains active RN license in Virginia" is a "Major Area of Responsibility," while "Current applicable license as an RN" is an "essential function." Certainly, an active nursing license is an essential function, even though it is also a "Major Area of Responsibility." The district court agreed and concluded that this factor also supported its conclusion that patient visits were an essential function of Tartaro-McGowan's job. JA018.

With regard to the third factor, Tartaro-McGowan contends that patient visits were not an essential function because she never before performed them in the past. This assertion takes the history of Tartaro-McGowan's employment with Inova Home Health entirely out of context. While it is true that clinical managers rarely performed direct care patient visits when Inova Home Health was adequately staffed and not dealing with a global pandemic, those were not the circumstances at the time of Tartaro-McGowan's alleged termination. *See* JA584; JA650-651. Second, Tartaro-McGowan's assertion that she *never* performed direct care patient visits is not true in light of her admission that she had to perform direct patient care when a nurse she was supervising was unable to draw blood. JA124. Giving Tartaro-McGown the benefit of the doubt, the district court did conclude that this factor alone weighed against finding that patient visits were an essential function of the clinical manager position. JA018.

28

The fourth factor very clearly weighs in favor of a finding that patient visits were an essential function of a clinical manager's position. The consequences of not performing the task were significant gaps in patient care that could not be filled with the staffing shortages created by the pandemic. As Tartaro-McGowan admitted:

> Q:     And, Laura, what would have happened if you weren't there to draw the blood?
>
> A:     The patient probably wouldn't have gotten their blood drawn.
>
> Q:     And would that have negatively potentially affected the patient?
>
> A:     I would say yes because the doctor was waiting for the results to provide care so I would say yes possibly.

JA130-131. Moreover, if the clinical manager position were truly just an office job, there would be no reason for Inova Home Health to mandate that employees receive yearly competency training. *See* JA096; JA536-537. Finally, during the pandemic, all individuals holding the title of clinical manager were required to perform field visits. JA268-269. Other internal staff, including Tartaro-McGowan's superiors, were also asked to and did, in fact, complete field visits until the staffing shortage abated.[4] JA568-569; JA328-329; JA356-372. The district court agreed that this

---

[4] Tartaro-McGowan suggests that some internal office staff did not complete at least six patient visits. *See* Tartaro-McGowan Br. at 25. Again, this misses the mark— only those employees who refused to perform *any* field visits ceased to be employed by Inova Home Health. If Tartaro-McGowan had performed a single visit, she may have maintained her job.

factor supported the conclusion that patient visits were essential functions of Tartaro-McGowan's position. JA019.

The sixth and seventh factors concern the experience of those currently in the clinical manager role and those who held that role in the past. While clinical managers rarely performed such visits in the past, it is undisputed that Inova Home Health required all internal office staff, including clinical managers, to perform direct care patient visits when the staffing shortage and pandemic necessitated it. With the exceptions of Tartaro-McGowan and clinical field staff liaison Emma Marshall, all internal office employees were required to, and, in fact did perform direct care patient visits. *See* JA328-329 (preceptors Amy Sahm and Anne Anastacio); JA356-370 (Sarah McClain, Cassandra Odom, Virginia Vasquez, Tifanni White, and *clinical manager* Deidra Witherspoon). Following their refusals, Tartaro-McGowan and Ms. Marshall were both deemed to have abandoned their jobs. *See* JA273. Accordingly, the district court appropriately found that these factors, when considered in the context of the pandemic, weighed in favor of finding that patient visits were an essential function of Tartaro-McGowan's position. JA019.

Tartaro-McGowan accuses the district court of "weighing the evidence" to conclude that direct care patient visits were an essential function of a clinical manager's position, but she does not identify any *disputed* evidence that the district court resolved and then relied upon. District courts can weigh the essential function

30

factors on summary judgment without resolving genuine disputes of material fact. *See, e.g.*, *Elledge*, 979 F.3d at 1009-10 (affirming summary judgment in favor of an employer and agreeing with a district court's conclusion that certain tasks were essential functions of the plaintiff's position); *Cook v. United Parcel Service, Inc.*, 4th Cir. No. 21-1693, 2022 WL 1090251, *2 (affirming summary judgment in favor of an employer because "[t]he district court correctly concluded that an essential function of the preload supervisor position was to lift packages in excess of the 20-pound restriction").

Because performing direct care patient visits was an essential function of Tartaro-McGowan's job, Defendants were not required to eliminate that function from her job duties entirely—the only accommodation Tartaro-McGowan demanded. The ADA does not require employers to change a position's essential functions, and it does not require an employer to split an employee's essential job functions across multiple employees. 29 C.F.R. § 1630.02(o)(1)(ii); *see also Elledge*, 979 F.3d at 1013; *Boone v. Board of Governors of Univ. of N. Carolina*, 858 F. App'x 622, 623-24 (4th Cir. 2021). Because Tartaro-McGowan insisted that Defendants eliminate an essential function of her job, her claim for denial of a reasonable accommodation fails as a matter of law.

### 3. Tartaro-McGowan's claim for failure to accommodate fails because Defendants offered her reasonable accommodations, which she refused.

Even if this Court does not conclude that direct care patient visits were an essential function of Tartaro-McGowan's job, her failure to accommodate claim still fails because Defendants offered her a reasonable accommodation. Once an employee requests an accommodation for a disability, the employer and the employee have a duty to engage in the interactive process. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 581 (4th Cir. 2015). "But the interactive process 'is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential functions of the position sought." *Wilson v. Dollar General Corp.*, 717 F.3d 345, 346-47 (4th Cir. 2013). If an employee rejects a reasonable accommodation, they are no longer considered a "qualified individual with a disability." *Andrews v. Commonwealth of Virginia*, 232 F.3d 886 (4th Cir. 2000); *see also Talley v. Family Dollar Stores of Ohio*, 542 F.3d 1099, 1108 (6th Cir. 2008).

The ADA requires a reasonable accommodation, not a perfect one. *Adams v. Anne Arundul Cnty. Pub. Schs.*, 789 F.3d 422, 433 (4th Cir. 2015). "An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested." *Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 415 (4th Cir. 2015). An employer "has the ultimate discretion to

choose between effective accommodations." *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019).

Defendants offered Tartaro-McGowan the two reasonable accommodations of selecting patient visits that were consistent with her restrictions and spacing visits out to prevent repeated stress on her knees. She refused both, even though they were both reasonable and adequately accommodated Tartaro-McGowan's alleged restrictions. Defendants' reasonable accommodation gave Tartaro-McGowan sole discretion to select whichever patient visits she felt comfortable performing. *See, e.g.*, JA337-338. In selecting visits, Tartaro-McGowan could review the patient's chart to determine their treatment needs and assess whether the layout of the patient's house or the location where care was provided would interfere with her restrictions. JA148-149. If she still had concerns about either, she could speak to a clinician who had previously provided care to the patient. JA148-149. Many of the tasks Tartaro-McGowan might be expected to perform could be done sitting or standing, without interfering with her restrictions. JA131-132; JA198-199; JA203-204; JA207; JA210. Tartaro-McGowan insists, in essence, that because she had to "expect the unexpected," self-selection was not a perfect accommodation. This concern is purely hypothetical. Even if this were a concern, Tartaro-McGowan admits that she had previously called 9-1-1 for assistance, called the agency for back-up help, or

solicited help from a patient's family member in the past. JA311; *see also* JA502. In short, assistance was available to Tartaro-McGowan, and she knew where to find it.

Moreover, the reasonable accommodation Defendants offered Tartaro-McGowan was similar to many of the tasks Tartaro-McGowan voluntarily performs in her personal life. For example, as a resident of a split level home and a season ticket holder for the Washington Nationals, Tartaro-McGowan regularly uses stairs. JA089-090; JA108-109. She also performs household tasks like carrying laundry, cleaning, taking out trash, and walking dogs on a regular basis. JA111-112. Tartaro-McGowan even provides nursing care for her husband. *Id.* Defendants did not ask Tartaro-McGowan to violate her medical restrictions, even though she voluntarily violated those restrictions in other aspects of her life.

Even if the accommodations Defendants offered Tartaro-McGowan were insufficient, she never suggested any alternatives other than just not completing an essential function of her job. In *Shin v. Univ. of Maryland Med. Sys. Corp.*, 369 F. App'x 472 (4th Cir. 2010), a medical resident insisted that his employer should accommodate his disability by assigning him fewer patient visits. The Fourth Circuit ultimately affirmed the district court's order granting summary judgment, concluding that the plaintiff was not qualified for his position. *Id.* As the *Shin* court observed, "The ADA does not require an employer to assign an employee to 'permanent light duty'; nor does it require an employer to reallocate job duties in

34

order to change the essential functions of a job, or hire an additional person to perform an essential function of a disabled employee's position." *Id.* at 482 (cleaned up). As in *Shin*, Tartaro-McGowan was unable to identify (or accept) an accommodation that would enable her to perform direct care patient visits and, for that reason, she was not qualified for her position.

Tartaro-McGowan argues that the reasonable accommodation offered to her was not actually a "reasonable accommodation" because Defendants offered the same accommodation to others. *See* Tartaro-McGowan Br. at 34-36. The ADA does not require a "special" accommodation; it requires employers to make reasonable accommodations that would enable a disabled employee to perform the essential functions of her job. *See Yochim v. Carson*, 935 F.3d 586, 592 (7th Cir. 2019); 29 C.F.R. § 1630.2(o). The key is enabling a qualified individual to perform the essential functions of their job, not whether other employees were also able to modify their jobs in the same way. *See id.* Consider the classic example of an employee who cannot stand for extended periods of time. That employee's employer complies with the ADA by providing the employee with a stool. The employer does not suddenly violate the ADA because it also provides stools to employees who are not disabled. In *Yochim*, the Court rejected a plaintiff's argument that modified scheduling was not a reasonable accommodation because, according to the plaintiff, those options "already were widely available to HUD employees without a

reasonable accommodation." *Yochim*, 935 F.3d at 592. According to that Court, "[T]his position misses the mark….It makes no difference that modified scheduling options might have been available to other HUD employees who obtained permission to telework from their manager." *Id.* In short, Defendants' reasonable accommodation did not lose its status as a reasonable accommodation just because it was offered to other employees that Tartaro-McGowan contends were not disabled.

Further, even if Defendants offered non-disabled employees the same accommodation it offered Tartaro-McGowan, Tartaro-McGowan must still prove that the accommodation did not enable her to perform the essential functions of her job. In other words, even if all internal office staff could screen their patient visits, Tartaro-McGowan still must prove that she needed an additional accommodation beyond that. If she did not need an accommodation, Defendants did not have a legal obligation to provide one.

### 4. Tartaro-McGowan was also unqualified for her position because she could not meet the physical requirements of her position.

When an employee cannot meet the physical requirements of an essential job function, they are not qualified for the position. *See Elledge*, *LLC*, 979 F.3d at 1010. In *Elledge*, the Fourth Circuit affirmed an order granting summary judgment to an employer when the employee admitted that he was unable to meet the specific physical requirements of the job, including walking "frequently," which was defined

36

as 34-66% of the time. *Id.* The plaintiff argued that because he could meet the lower end of the percentage range listed on the job description, he was qualified. *Id.* The Court rejected that argument, stating, "A worker whose strength allows him to lift a maximum of 75 pounds is unfit for a job that requires workers to be able to lift loads weighing between 50 and 100 pounds." *Id.* As a result, the court concluded that the plaintiff was not qualified for his position. *Id.* Similarly, when Tartaro-McGowan testified about the physical requirements listed on her job description, she admitted that she could not fulfill the bending, lifting, or stooping requirements of the clinical manager position. JA161-162; JA167-169. For this additional reason, Tartaro-McGowan was not qualified for her position.

**C.    The *McDonnell-Douglas* Burden Shifting Framework.**

Courts analyze Tartaro-McGowan's remaining claims (excluding her failure to accommodate claim) using the *McDonnell-Douglas* burden-shift framework. *See Laird v. Fairfax Cnty. Virginia*, 978 F.3d 887 (4th Cir. 2020) (applying *McDonnell-Douglas* to a disability discrimination claim); *Perry v. Computer Sciences Corp.*, 429 F.App'x. 218, 219-20 (4th Cir. 2011) (applying *McDonnell-Douglas* to a retaliation claim under the ADA); *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (applying *McDonnell-Douglas* to ADEA claims). Under that framework, the plaintiff must first establish a *prima facie* case for each of her claims. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). If the plaintiff

establishes a *prima facie* case, the burden then shifts to the employer to provide a legitimate, non-discriminatory or non-retaliatory reason for the adverse action. *Id.*; *Westmoreland*, 924 F.3d at 725. The burden on the employer is one of production, not persuasion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If the defendant articulates a legitimate reason for the adverse action, the burden then shifts back to the plaintiff to prove that the employer's reason was a pretext for unlawful discrimination or retaliation. *McDonnell Douglas*, 411 U.S. at 804; *Westmoreland*, 924 F.3d at 726. "The ultimate burden of persuading the trier of fact remains with the employee at all times." *Westmoreland*, 924 F.3d at 726 (internal quotations and citation omitted).

## D.   The District Court Properly Dismissed Tartaro-McGowan's Claim for Disability Discrimination.

### 1.   Elements of a *prima facie* case.

To establish a *prima facie* case of disability discrimination, Tartaro-McGowan must identify facts showing (1) she was a qualified individual with a disability; (2) she suffered an adverse employment action; (3) she was meeting her employer's legitimate expectations at the time of the adverse employment action; and (4) the circumstances of the adverse employment action raise a reasonable inference of unlawful discrimination. *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012). Tartaro-McGowan cannot establish any of the elements of her *prima facia* case.

## 2. Tartaro-McGowan's claim for disability discrimination fails because Tartaro-McGowan cannot establish any element of her *prima facie* case.

First, for the reasons outline in Sections III(B)(3) and (4), Tartaro-McGowan was not qualified for her position, as she neither met the physical requirements of her position and because she refused a reasonable accommodation. This prevents Tartaro-McGowan from establishing the first element of her *prima facie* case and, as the district court agreed, warranted an entry of summary judgment. The district court found that Tartaro-McGowan was not qualified for her position because she could not perform the essential function of direct care patient visits. JA025. That is true, but Tartaro-McGowan was also not qualified because she could not meet the physical requirements in her job description and because she turned down a reasonable accommodation, as discussed above. Finding that Tartaro-McGowan was not qualified for her position for any one of these three reasons is sufficient to defeat her claim on the first element.

Tartaro-McGowan cannot meet the second element of her *prima facie* case because she abandoned her position. As Ms. Nesterick warned Tartaro-McGowan on June 22, 2020, "I do need to inform you that this is your final warning…. If you decide not [to] go into the field, then this will be considered job abandonment, and you will no longer be employed by Inova Home Health effective June 24th." JA352. Tartaro-McGowan abandoned her job following Ms. Nesterick's exact

instructions—she declined to perform any patient visits by the deadline. JA280. She even went a step further by clearing out her office the day before. JA283-284. Because Tartaro-McGowan abandoned her position, she cannot establish that she suffered an adverse employment action by Defendants.

To meet the third element of her disability discrimination claim, Tartaro-McGowan must produce evidence showing that she met Defendants' legitimate expectations. *Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012). At the time of Tartaro-McGowan's alleged termination, Tartaro-McGowan acknowledged that internal office staff, including her, were asked to perform field visits. JA268-269, JA305-307. All internal office staff who did, in fact, perform direct care patient visits remained employed by Inova Home Health after June 24, 2020. *See* JA268, JA305-307. Tartaro-McGowan and the other members of the internal office staff who refused to fulfill this expectation ceased to be employed by Inova Home Health after that date. Further, Defendants' expectation that internal office staff perform field visits was legitimate because Inova Home Health had suffered from severe staffing shortages following the onset of the COVID-19 pandemic. *See* JA568-569. Defendants even went so far as to send staff from ASHN's Dayton, Ohio headquarters to perform field visits for Inova Home Health in Virginia. JA217-218; JA328-329. Defendants' expectation that all available internal office staff cover the uncovered field visits was reasonable, and Tartaro-

McGowan's failure to meet it defeats her *prima facie* case, as the district court appropriately found. JA025.

Tartaro-McGowan's *prima facie* case also fails on the fourth element because she cannot identify circumstances that give rise to the reasonable inference of discrimination. Importantly, Defendants offered Tartaro-McGowan a reasonable accommodation that allowed her to perform visits consistent with her restrictions. *See* JA336-340; JA344-347; JA348-350; JA351-355. They participated in the interactive process with Tartaro-McGowan until Tartaro-McGowan refused to continue the dialogue by insisting upon her preferred accommodation. *See* JA344-347; JA348-350; JA351-355. Even Tartaro-McGowan admits that no employee of Defendants made a disparaging remark about her requestion for an accommodation. JA308-310. Again, as the district court found, Tartaro-McGowan's failure to meet these element warrants summary judgment against her. JA025-026.

### 3. If Tartaro-McGowan can establish that Defendants took an adverse employment action, her claim fails because Defendants had a legitimate, non-discriminatory reason to terminate her employment.

Assuming *arguendo* that Tartaro-McGowan can establish that Defendants terminated her employment, they had a legitimate, non-discriminatory reason for doing so. Specifically, Tartaro-McGowan refused to complete any direct care field visits by the June 24, 2020 deadline. After multiple requests that Tartaro-McGowan perform direct care field visits to deal with the pandemic-induced staffing shortage,

Field Administrator Kathleen Nesterick eventually informed Tartaro-McGowan in unambiguous terms that Inova Home Health expected her to begin assisting with field visits by June 24, 2020. JA352; JA275; JA472. She even characterized this as a "final warning." *Id.* In equally unambiguous terms, Tartaro-McGowan concedes that she did not perform any field visits as directed:

> Q:   As of June 24th, 2020, you did not go into the field to perform any direct patient care site visits, correct?
>
> A:   That's correct.

JA280; *see also* JA472. Tartaro-McGowan's employment ended effective that date. JA355; JA281-282; *see also* JA475-476. Tartaro-McGowan had refused a directive to assist with a dire need for patient care, and her refusal was a lawful reason to terminate her employment. The district court agreed. JA026.

### 4.    Tartaro-McGowan cannot establish that Defendants' legitimate, non-discriminatory reason to terminate her employment was a pretext for unlawful discrimination.

Tartaro-McGowan's disability discrimination claim fails because she cannot demonstrate that Defendants' legitimate, non-discriminatory reason to terminate her employment was a pretext for unlawful discrimination. To establish pretext, Tartaro-McGowan must show "both that the reason advanced was a sham and that the true reason was an impermissible one under the law." *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1235 (4th Cir. 1995). In determining whether Tartaro-McGowan can establish pretext, "[I]t is not [the court's] province to decide whether the reason was

wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (citation omitted). "The plaintiff can prove pretext by showing that the defendant's 'explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of…discrimination.'" *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004).

As the district court concluded, "The record contains no evidence that Defendants harbored a discriminatory motive in terminating Plaintiff, or that they implemented a hidden purpose in terminating her on the basis of her physical limitations or some other unlawful reason." JA026. Tartaro-McGowan concedes that all internal office staff, including the other person that held the clinical manager position, were all asked to perform direct patient care field visits. JA268-269, JA305-307. She concedes that Defendants, through both Joan VanZant and Ms. Nesterick, emailed her repeatedly about the need for internal office staff to assist with field visits in light of the staffing shortage. *See* JA328-335; JA336-340, JA344-347; JA348-350; JA351-355; JA356-372. And she concedes that she received a "final warning" from Ms. Nesterick. JA274-275. In fact, she cleaned out her office the day before her deadline to complete a patient visit. JA283-284. Tartaro-McGowan accurately predicted the end of her employment based on Defendants'

repeated communications with her. *See* JA352. She can neither rebut Defendants'
reason for her alleged termination nor prove that discrimination was the real reason.

Tartaro-McGowan accuses Defendants of changing their reason for her
alleged termination, pointing to Ms. Nesterick's observation that she had cleaned out
her office the day before her employment ending and, for the first time on appeal, to
a document that shows that Tartaro-McGowan also missed an appointment on June
25, 2022. *See* Tartaro-McGowan Br. at 12 and 43-44. This selective and creative
reading of a single document is refuted by that document, as well as Ms. Nesterick's
other emails. Specifically, on June 22, 2020, Ms. Nesterick informed Tartaro-
McGowan that she needed to perform a field visit by June 24, 2020. JA352. She
didn't. JA287. The following day, Tartaro-McGowan even asked if she was still
employed—implicitly acknowledging that she had not complied with a clear
directive from her Field Administrator. JA353-354. *see also* JA287. Ms. Nesterick
confirmed that she was not. *Id.* In the same vein, Ms. Nesterick's email confirming
that Tartaro-McGowan's employment had ended as of June 24, 2020, implicitly
rejects any argument that Defendants terminated Tartaro-McGowan after that date.
*See id.* Defendants' reason for termination remained consistent throughout the weeks
Inova Home health begged Tartaro-McGowan to do her job, until it ended on June
24, 2020.

Finally, Tartaro-McGowan attempts to rely on employees that were not similarly situated to establish pretext. To be deemed valid comparators, employees must be "similarly situated in all respects." *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (citation omitted). Courts consider whether alleged comparators "(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Id.* (citation omitted). First, all three of Tartaro-McGowan's alleged comparators were remote workers, not internal office staff. JA266-267. On that fact alone, they were not similarly situated. By contrast, all employees who worked in the office with Tartaro-McGowan were sent into the field to perform direct patient care. JA268-269. The record lacks any evidence that the remote employees were trained to perform field visits, and it lacks evidence that the remote employees were geographically close enough to perform such field visits. In particular, Tartaro-McGowan complains that Ugo Agwu *wanted* to be trained to perform field visits. But, as Tartaro-McGowan admits, Ugo Agwu did not have the training to perform field visits *at the time Tartaro-McGowan was asked to perform them*. JA812-813.

Tartaro-McGowan also alleges that the only other employee to request a reasonable accommodation, Emma Marshall, was denied such accommodation. First, the record before the district court was completely devoid of evidence that Ms.

Marshall was disabled under the ADA.[5] Second, Defendants offered Ms. Marshall the same accommodation they offered Tartaro-McGowan—the ability to screen patients. When Ms. Marshall, who had performed direct care patient visits up until the pandemic began, refused to perform any such visits, her employment with Inova Home Health also ended. JA273.

## E.     The District Court Properly Dismissed Tartaro-McGowan's Claim for Retaliation.

Tartaro-McGowan's retaliation claim fails because she cannot establish the causation element and because Inova Home Health had a legitimate, non-discriminatory reason for Tartaro-McGowan's alleged termination, Tartaro-McGowan cannot establish a pretext for unlawful retaliation. To establish a *prima facie* case of retaliation, a plaintiff must establish that (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) the adverse action was causally connected to her protected activity. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (citations omitted). For purposes of summary judgment only, Defendants did not contest the first element.

For the reasons identified in Section III(D)(3), above, Tartaro-McGowan cannot establish that she suffered an adverse employment action.

---

5 The "evidence cited by Tartaro-McGowan on this point does not even address whether Ms. Marshall has a disability. *See* Tartaro-McGowan Br. at 40.

46

Tartaro-McGowan's retaliation claim also fails on the causation element because she admits that no representatives of either Defendant ever made a disparaging comment about her request for an accommodation. JA308-310. Indeed, Defendants offered Tartaro-McGowan an accommodation that was consistent with her restrictions. *See* JA336-340, JA344-347; JA348-350; JA351-355. When Tartaro-McGowan rejected the accommodation, Inova Home Health asked her to propose an alternative accommodation. JA347. She never did so. For this reason, Tartaro-McGowan cannot establish the causation element.

Further, for the reasons explained above, Defendants had a legitimate, non-retaliatory reason for Tartaro-McGowan's alleged termination—her refusal to perform an essential function of her job when Inova Home Health desperately needed clinicians to fulfill patients' needs. This was not a pretext for unlawful retaliation for the reasons explained in Section III(D)(4), above, and for this additional reason, her retaliation claim fails.

## F.     The District Court Appropriately Dismissed Tartaro-McGowan's Age Discrimination Claim.

Tartaro-McGowan did not contest Defendants' Motion for Summary Judgment as it relates to her claim for age discrimination. For this reason, the district court properly concluded that Tartaro-McGowan had abandoned this claim. JA015. *United Supreme Council, 33 Degree of the Ancient and Accepted Scottish Rite of Freemasonry Prince Hall Affiliation, Southern Jurisdiction of the United States of*

47

*America, a Tennessee Non-Profit Corporation v. United Supreme Council of the Ancient and Accepted Scottish Rite of Freemasonry Prince Hall Affiliated, a District of Columbia Non-Profit Corporation*, 792 F.App'x 249, 259 (4th Cir. 2019). Tartaro-McGowan cannot now pursue an abandoned claim on appeal. *Id.*

Defendants understand that Tartaro-McGowan is no longer pursuing her age discrimination claim. However, out of an abundance of caution, that claim, too, fails on its merits. To establish a *prima facie* case of age discrimination using the indirect method, a plaintiff must show "that (1) at the time of her firing, she was at least 40 years of age; (2) she was qualified for the job and performing in accordance with her employer's legitimate expectations; (3) her employer nonetheless discharged her; and (4) a substantially younger individual with comparable qualifications replaced her." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019). The ultimate burden of proof on the issue of causation lies with the plaintiff, and a plaintiff "cannot prevail on an age discrimination claim by showing that age was *one* of multiple motives for an employer's decision." *Westmoreland*, 924 F.3d at 725 (internal citations omitted). For purposes of summary judgment only, Defendants did not contest the first element of Tartaro-McGowan's *prima facie* case.

Tartaro-McGowan's *prima facie* case, however, fails on the second, third, and fourth elements. With regard to the second element and as outlined above, Tartaro-McGowan did not comply with Defendants' expectation that she perform field visits

48

to deal with the massive staffing shortages that resulted from the pandemic. JA218. With regard to the third element, Tartaro-McGowan cannot establish that she suffered an adverse employment action for the reasons discussed in Section III(D)(3), above. With regard to the fourth element, Tartaro-McGowan admits that she does not know who, if anyone, replaced her, and there is no evidence in the record even identifying the ages of Inova Home Health's current clinical managers. JA308. Accordingly, Tartaro-McGowan cannot establish a *prima facie* case of age discrimination.

Even if Tartaro-McGowan could establish a *prima facie* case, Defendants have identified the legitimate, non-discriminatory reason for her alleged termination. Tartaro-McGowan cannot establish that this reason was a pretext for discrimination, nor can she prove that her age was the "but for" cause of her termination. *Westmoreland*, 924 F.3d at 725 (internal citations omitted). For this additional reason, her claim for age discrimination warrants dismissal upon entry of summary judgment.

## CONCLUSION

COVID-19 radically changed Inova Home Health's operations, and the sudden staffing shortages necessitated sending internal office staff, who had all of the training necessary to perform direct care field visits, into the field. When Tartaro-McGowan requested an accommodation for her alleged arthritis of the knee,

49

Defendants provided her with two accommodations that allowed Tartaro-McGowan sole discretion to select which patients she treated, ensuring that neither the care required nor any of the conditions surrounding the provision of that care would interfere with her alleged restrictions. Tartaro-McGowan refused these accommodations, and she refused to propose any alternatives other than the accommodation she initially demanded. The law does not require an employer to provide an employee with their preferred accommodation, and it certainly does not require an employer to eliminate an essential function of an employee's job. Had Tartaro-McGowan accepted the reasonable accommodation Defendants offered her and performed direct care patient visits, she could have helped Inova Home Health get its patients through the early stages of the pandemic. Tartaro-McGowan failed to perform the field visits she was required to perform, even with the reasonable accommodation offered to her, and for that reason, she is no longer employed by Inova Home Health. Tartaro-McGowan's allegations of age discrimination and various violations of the ADA are meritless; the Court should affirm the district court's order dismissing her case in its entirety.

Respectfully submitted,

*/s/ Steven E. Seasly*
Steven E. Seasly, Esq.
(Ohio Bar No. 0070536)
sseasly@hahnlaw.com
Andrew J. Wolf, Esq.
(Ohio Bar No. 0091054)
awolf@hahnlaw.com
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio 44114
216.621.0150 – Telephone
216.241.2824 – Facsimile

*Counsel for Defendants-Appellees*
*Inova Home Health, LLC and*
*Alternate Solutions Health Network,*
*LLC*

## REQUEST FOR ORAL ARGUMENT

Pursuant to FED. R. APP. P. 32 and Local Rule 34(a), Defendants-Appellees

Inova Home Health, LLC and Alternate Solutions Health Network, LLC submit that

oral argument would allow the parties to clarify the issues that are relevant to

resolution of Plaintiff-Appellee's appeal.

/s/ Steven E. Seasly
Counsel for Defendants-Appellees
Inova Home Health, LLC and
Alternate Solutions Health Network, LLC

## <u>CERTIFICATE OF COMPLIANCE</u>

This is to certify that the *Response Brief of Defendants-Appellees Inova Home Health, LLC and Alternate Solutions Health Network, LLC* complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7)(B) because it contains 11,320 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typecase and type style requirements because it was prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

<div style="margin-left:40%">

/s/ Steven E. Seasly
*Counsel for Defendants-Appellees*
*Inova Home Health, LLC and*
*Alternate Solutions Health Network, LLC*

</div>

53

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on November 16, 2022 a true and correct copy of the

foregoing *Response Brief of Defendants-Appellees Inova Home Health, LLC and*

*Alternate Solutions Health Network, LLC* was served by operation of the Court's

electronic filing system on:

Timothy M. Belknap, Esq.
timothy.belknap@leschtlaw.com
Tamara L. Slater, Esq.
tamara.slater@leschtlaw.com
Alan Lescht & Associates, PC
1825 K Street NW, Suite 750
Washington, DC 20006

*Attorneys for Plaintiff-Appellant*

/s/ Steven E. Seasly
*Counsel for Defendants-Appellees*
*Inova Home Health, LLC and*
*Alternate Solutions Health Network, LLC*